**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

---

WILLIAM WHITFORD, et al.,

       Plaintiffs,

       v.                                 No. 15-cv-421-jdp

BEVERLY R. GILL, et al.,

       Defendants.

THE WISCONSIN ASSEMBLY
DEMOCRATIC CAMPAIGN COMMITTEE,

       Plaintiff,

       v.                                 No. 18-cv-763-jdp

BEVERLY R. GILL, et al.,

       Defendants.

---

### *WHITFORD* PLAINTIFFS' AND WISCONSIN ASSEMBLY DEMOCRATIC CAMPAIGN COMMITTEE'S JOINT BRIEF IN OPPOSITION TO WISCONSIN STATE ASSEMBLY'S MOTIONS TO DISMISS

---

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................6

    **I.   The Supreme Court's Decision in Whitford** ..............................................7

        A.  Partisan Vote Dilution Standing ..................................................................7

        B.  A District-Specific Claim ...........................................................................9

        C.  The Associational Theory .........................................................................11

    **II.  Plaintiffs' Compliance with *Whitford*'s Mandate** ................................12

        A.  Partisan Vote Dilution Standing ................................................................12

        B.  A District-Specific Claim .........................................................................16

        C.  The Associational Theory .........................................................................19

STANDARD OF REVIEW ..............................................................................................22

ARGUMENT ...................................................................................................................22

    **I.   This Court Need Not and Should Not Address Arguments Beyond the Scope of the Supreme Court's Mandate.** ..........................................................23

        D.  The Mandate Rule .....................................................................................23

        B.  The Law of the Case ..................................................................................25

        C.  Past Redistricting Practice ........................................................................26

    **II.  This Court Should Reject the Assembly's Arguments That Are Within the Scope of the Supreme Court's Mandate.** ...............................29

        A.  Partisan Vote Dilution Standing ................................................................29

        B.  A District-Specific Claim .........................................................................29

        C.  The Associational Theory .........................................................................33

    **III.  This Court Should Reject the Assembly's Arguments That Are Beyond the Scope of the Supreme Court's Mandate.** .........................39

        A.  Nonjusticiability ........................................................................................39

        B.  Intent Prong ...............................................................................................40

        C.  Majoritarianism and Proportionality ........................................................40

        D.  Voter Partisanship .....................................................................................42

E.   Identifiable Group ..................................................................................44

F.   Other Redistricting Theories ..................................................................45

G.   Justification ...........................................................................................47

H.   Imputations ...........................................................................................49

I.   Toy Examples ........................................................................................50

J.   Lack of Mechanism ...............................................................................51

K.   Nonpartisan Races ................................................................................52

**CONCLUSION** .............................................................................................52

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*Ala. Legislative Black Caucus v. Alabama,*

    135 S. Ct. 1257 (2015)................................................................................28

*Ala. Legislative Black Caucus v. Alabama,*

    231 F. Supp. 3d 1026 (M.D. Ala. 2017)..................................................28

*Anderson v. Celebrezze,*

    460 U.S. 780 (1983) ..........................................................................20, 37

*Anne Arundel Cty. Republican Cent. Comm. v. State Admin. Bd. of Election Laws,*

    781 F. Supp. 394 (D. Md. 1991)..............................................................39

*Arizona v. California,*

    460 U.S. 605 (1983) ................................................................................25

*Badham v. Eu,*
    694 F. Supp. 664 (N.D. Cal. 1988)................................................ 39, 39-40

*Baker v. Carr,*

    369 U.S. 186 (1962) ................................................................................32

*Benisek v. Lamone,*

    ___ F. Supp. 3d ___, 2018 WL 5816831 (D. Md. 2018) ..................................35

*Bethune-Hill v. Va. State Bd. of Elections,*

    137 S. Ct. 788 (2017)...............................................................................28

*Bethune-Hill v. Va. State Bd. of Elections,*

    326 F. Supp. 3d 128 (E.D. Va. 2018) .................................................. 28-29

*Bonte v. U.S. Bank, N.A.,*

    624 F.3d 461 (7th Cir. 2010) ...................................................................22

*Brown v. Thomson,*

    462 U.S. 835 (1983) ..........................................................................32, 49

*Buckley v. Valeo,*

    424 U.S. 1 (1976) ....................................................................................36

*Burdick v. Takushi*,

    504 U.S. 428 (1992) ..................................................................................20, 21

*Cal. Democratic Party v. Jones*,

    530 U.S. 567 (2000) ..........................................................................................37

*Christianson v. Colt Indus. Operating Corp.*,

    486 U.S. 800 (1988) ..........................................................................................25

*Christianson v. Colt Indus. Operating Corp.*,

    870 F.2d 1292 (7th Cir. 1989) ..........................................................................26

*Common Cause v. Rucho*,

    279 F. Supp. 3d 587 (M.D.N.C. 2018) ............................................................27

*Common Cause v. Rucho*,

    318 F. Supp. 3d 777 (M.D.N.C. 2018) ..................................... 27-28, 28, 34, 35

*Connor v. Finch*,

    431 U.S. 407 (1977) ..........................................................................................50

*Covington v. State*,

    267 F. Supp. 3d 664 (M.D.N.C. 2017) ............................................................29

*Creek v. Vill. of Westhaven*,

    144 F.3d 441 (7th Cir. 1998) ............................................................................24

*Cty. of Los Angeles v. Davis*,

    440 U.S. 625 (1979) ..........................................................................................26

*Davis v. Bandemer*,

    478 U.S. 109 (1986) ..........................................................................................41

*Elrod v. Burns*,

    427 U.S. 347 (1976) ....................................................................................36, 37

*Gill v. Whitford*,

    138 S. Ct. 1916 (2018) ...............................................................................*passim*

*Hays v. Louisiana*,

    936 F. Supp. 360 (W.D. La. 1996). ..................................................................29

*In re Evanston Nw. Corp. Antitrust Litig.*,

    No. 07–cv–04446, 2013 WL 6490152 (N.D. Ill. Dec. 10, 2013) ................................ 26-27

*Indep. Trust Corp. v. Stewart Info. Servs. Corp.*,

    665 F.3d 930 (7th Cir. 2012) .................................................................... 22-23

*Initiative and Referendum Inst. v. Walker*,

    450 F.3d 1082 (10th Cir. 2006) ........................................................... 38-39, 39

*Johnson v. De Grandy*,

    512 U.S. 997 (1994) ........................................................................................48

*Karcher v. Daggett*,

    462 U.S. 725 (1983) ........................................................................................32

*Kovacs v. United States*,

    739 F.3d 1020 (7th Cir. 2014) .......................................................................24

*League of United Latin Am. Citizens v. Perry*,

    548 U.S. 399 (2006) ...............................................................33, 37, 47, 48

*League of Women Voters v. Johnson*,

    ___ F. Supp. 3d ___, 2018 WL 6257476 (E.D. Mich. 2018) ...........................35

*League of Women Voters v. Quinn*,

    No. 1:11–cv–5569, 2011 WL 5143044 (N.D. Ill. Oct. 28, 2011) ....................39

*Miller v. Johnson*,

    515 U.S. 900 (1995) ........................................................................................48

*Moore v. Anderson*,

    222 F.3d 280 (7th Cir. 2000) .........................................................................24

*Montana v. United States*,

    440 U.S. 147 (1979) ........................................................................................25

*NAACP v. Alabama*,

    357 U.S. 449 (1958) ........................................................................................36

*North Carolina v. Covington*,

    137 S. Ct. 1624 (2017) ....................................................................................29

*Ohio A. Philip Randolph Inst. v. Smith*,

    ___ F. Supp. 3d ___, 2018 WL 3872330 (S.D. Ohio 2018) .................................. 35, 36, 40

*Pearson v. Edgar*,

    153 F.3d 397 (7th Cir. 1998) ........................................................................... 26

*Richards v. Mitcheff*,

    696 F.3d 635 (7th Cir. 2012) ........................................................................... 23

*Rucho v. Common Cause*,

    138 S. Ct. 2679 (2018) ................................................................................... 27

*Shapiro v. McManus*,

    136 S. Ct. 450 (2015) ................................................................................. 5, 40

*Thornburg v. Gingles*,

    478 U.S. 30 (1986) ........................................................................ 32, 33, 47, 49

*United States v. Hays*,

    515 U.S. 737 (1995) ....................................................................................... 29

*United States v. Husband*,

    312 F.3d 247 (7th Cir. 2002) ...................................................................... 24, 25

*United States v. M.C.C. of Fla., Inc.*,

    967 F.2d 1559 (11th Cir. 1992) ........................................................................ 26

*United States v. Morris*,

    259 F.3d 894 (7th Cir. 2001) ...................................................................... 24, 25

*United States v. Polland*,

    56 F.3d 776 (7th Cir. 1995) ............................................................................. 24

*United States v. White*,

    406 F.3d 827 (7th Cir. 2005) ........................................................................... 24

*Vieth v. Jubelirer*,

    541 U.S. 267 (2004) .................................................................................. 11, 34

*Voinovich v. Quilter*,

    507 U.S. 146 (1993) ....................................................................................... 49

*Wirzburger v. Galvin*,

    412 F.3d 271 (1st Cir. 2005)...............................................................................39

**Other Authorities**

Daniel P. Tokaji, *Gerrymandering and Association*,

    59 Wm. & Mary L. Rev. 2159 (2018) ...............................................................37

## INTRODUCTION

The Wisconsin State Assembly ("Assembly") has filed an odd, almost inexplicable, brief in support of its motion to dismiss. This case is before this Court on remand from the Supreme Court so that a strictly circumscribed set of issues may be addressed. Yet the Assembly has next to nothing to say about these issues. Instead, the Assembly launches a far-ranging attack on the standard for partisan vote dilution claims that Plaintiffs[1] proposed in their original complaint in July 2015. But that standard was superseded long ago as Plaintiffs revised their suggested test in response to this Court's rulings. As discussed below, Plaintiffs have now further refined their proposal based on the Supreme Court's decision in *Gill v. Whitford*, 138 S. Ct. 1916 (2018). In addition to being obsolete, the Assembly's criticisms are redundant. This Court has heard almost all of them before—and already explained why they are wrong. The Court thus need not waste its time pointing out the arguments' errors once more.

In *Whitford*, the Supreme Court did not reach the merits of partisan vote dilution claims. Instead, the Court held that Plaintiffs had not yet proven their standing to bring such claims, and clarified how they should do so on remand. *First*, a litigant must show that "the particular composition of the voter's own district . . . causes his vote [to be] packed or cracked." *Id.* at 1931. And *second*, a litigant must establish that his vote "carr[ies] less weight than it would carry in another, hypothetical district"—in other words, that he could be *un*packed or *un*cracked by a different set of boundaries. *Id.* Having explained the proper approach to standing, the Court vacated the judgment below and remanded so that "plaintiffs may attempt to demonstrate standing in accord with the analysis in this opinion." *Id.* at 1923.

While the Court's only holding pertained to standing, two further developments in *Whitford* are relevant here. One is that a partisan vote dilution claim should be district-specific, not plan-

---

[1] The individual Plaintiffs and the Assembly Democratic Campaign Committee jointly file this brief.

wide. That way the scope of the claim is congruent with the standing inquiry, which is limited to a plaintiff's own district. That way, too, the Court's comments about remedies, and Justice Kagan's remarks about discriminatory intent, become explicable. The Court stated that "the remedy that is proper and sufficient lies in the revision of the boundaries of the individual's own district"—a position that dovetails neatly with a district-specific claim. *Id.* at 1930. Likewise, Justice Kagan focused on the "illicit partisan intent" underlying "individual districting decisions"—again, an emphasis that is sensible only if partisan vote dilution challenges proceed district by district. *Id.* at 1937 (Kagan, J., concurring).

The other development in *Whitford* is the associational theory of partisan gerrymandering that Justice Kagan presented in her concurrence. On this account, the harm of gerrymandering is not the dilution of the targeted party's voters, but rather the associational burdens that these voters (as well as their preferred party) experience because of the manipulation of the district lines. As Justice Kagan elaborated, these burdens may include "difficulties fundraising, registering voters, attracting volunteers, generating support from independents, and recruiting candidates to run for office (not to mention eventually accomplishing their policy objectives)." *Id.* at 1938. As Justice Kagan also observed, the burdens are plan-wide in nature since they are suffered equally by voters, party members, and party officials throughout the jurisdiction. Thus when an associational claim is brought, "its litigation should be statewide too—as to standing, liability, and remedy alike." *Id.* at 1940.

In response to the Court's decision, Plaintiffs have exclusively addressed these three areas of standing, stating and proving a district-specific test for partisan vote dilution, and mounting an associational claim. Indeed, as a redline comparison of Plaintiffs' original and amended complaints reveals, these are the *only* areas where Plaintiffs have made any non-cosmetic changes *at all*. *First*, as to standing, Plaintiffs have added twenty-eight more individual voters (and supporters of

Democratic candidates and policies) as litigants. Plaintiffs have also provided Defendants with an expert report from Professor Jowei Chen documenting that each individual voter asserting partisan vote dilution standing (1) *does* live in a cracked or packed Assembly district; and (2) would be *un*cracked or *un*packed by an alternative Assembly map randomly generated by a computer algorithm without any consideration of partisanship.

*Second*, with respect to a district-specific test for partisan vote dilution, Plaintiffs propose that the analysis unfold as follows: Initially, to prove standing, each individual voter must establish that her own district was cracked or packed, and unnecessarily so. Next, each individual voter must demonstrate that this needless cracking or packing was *deliberate*. In other words, district-specific partisan intent must be shown, based on whatever evidence (including statewide material) is relevant to the issue. Professor Kenneth Mayer's expert report includes detailed discussions of the Assembly districts that were unnecessarily cracked or packed, from which district-specific partisan intent may be inferred. Then, if a plaintiff makes it this far, she would have to satisfy the *plan-wide* discriminatory effect and justification prongs already adopted by this Court. This plan-wide stage would ensure that a district is struck down only if it belongs to a district map that is itself dilutive. Lastly, the remedy for a violation would be the redrawing of the invalidated district (not the plan as a whole).

And *third*, as to the associational claim, Plaintiffs have pled it separately and explained how it should work doctrinally. As with any such challenge, a court should first determine the severity of the burdens that have been imposed on the litigants' associational rights. The court should then vary the stringency of judicial scrutiny based on the extent of these burdens. Plaintiffs have also added allegations that each individual voter has experienced severe infringements of her associational rights because of Act 43. The Assembly Democratic Campaign Committee ("ADCC"), furthermore, has filed a suit arguing that it too, the party organization representing

3

Assembly Democratic members and candidates, has suffered severe associational burdens due to Act 43. These claims by the individual voters and the ADCC are substantiated by empirical evidence in Professor Mayer's expert report.

In its statements since the Supreme Court's decision in *Whitford*, this Court has shared Plaintiffs' view that only proceedings addressing the areas affected by that decision are now required. In its August 16, 2018 scheduling order, for example, the Court declared that "we are not starting a . . . brand-new case," and expressed its desire for the "expeditious resolution of this case within the mandate of the Supreme Court." Dkt. 199, at 1, 1-2.[2] Similarly, Judge Peterson noted at the October 16, 2018 preliminary pretrial conference that "[w]e're not starting over from scratch" and that "the purpose of the remand from the Supreme Court" is to take "discovery pertaining to the standing issues" and to "develop and flesh out the associational rights theory." Dkt. 215, at 6, 11.

Unfortunately, the Assembly holds a position about what proceedings are now appropriate that is radically different from that of both Plaintiffs and this Court. In its intervention filings, the Assembly contradicted the Court by asserting that this is, in fact, a "brand new" case, dkt. 210, at 4, and that, actually, "[n]othing has been adjudicated," dkt. 220, at 6. Consistent with this defiant stance, only a handful of the many arguments the Assembly makes in its eighty-two-page motion-to-dismiss brief have anything to do with the Supreme Court's decision in *Whitford*. Even fewer of the Assembly's claims plausibly fall within the scope of the Court's mandate—and thus within this Court's responsibilities on remand. Instead, the vast majority of the Assembly's contentions are entirely unmoored from *Whitford*, amounting to a list of grievances about a proposal that has

---

[2] Unless otherwise indicated, all docket references ("Dkt.") are to the docket in the *Whitford* action, case number 15-cv-421-jdp.

been obsolete for more than three years. Most of these points, moreover, are ones this Court has previously considered in detail and then rejected.[3]

This Court need not and should not rule on the Assembly's arguments that lie beyond the scope of the Supreme Court's mandate. Nor should this Court allow the Assembly to sidetrack the discovery process or the subsequent trial by pursuing these extraneous matters. After all, as the Court observed in granting the Assembly's motion to intervene, the Assembly has promised to "abide by the parameters set forth in the court's preliminary pretrial conference order." Dkt. 223, at 4. These parameters, again, include the "expeditious resolution of this case *within* the mandate of the Supreme Court." Dkt. 199, at 1-2 (emphasis added). Abundant precedent supports this course of action, including case law on (1) the mandate rule; (2) the law of the case; and (3) redistricting litigation after a Supreme Court vacatur.

In this brief, accordingly, Plaintiffs prioritize responding to the Assembly's few arguments that fall within the scope of the Supreme Court's mandate. Contra the Assembly, *Whitford* in no way precludes this Court from requiring a district plan to be severely, durably, and unjustifiably dilutive before striking down any of its constituent districts. Indeed, this plan-wide stage usefully *limits* the reach of a partisan vote dilution test, and has analogues in every other kind of vote dilution case. Nor should the Court dismiss the associational claim brought by the individual voters and the ADCC, since it is "a legal theory put forward by a Justice of th[e Supreme] Court and uncontradicted by the majority in any of [the Court's] cases." *Shapiro v. McManus*, 136 S. Ct. 450, 456 (2015). It is no defense, moreover, that Act 43 does not *facially* burden associational rights; as shown by several past cases, it suffices if these rights are infringed as a predictable result of a law's operation.

---

[3] The Assembly's expert reports continue this strategy, focusing on voter behavior and political geography. Neither of these topics is plausibly within the Supreme Court's mandate; both have been exhaustively addressed earlier in this litigation.

With respect to the Assembly's many arguments that are beyond the scope of the Supreme Court's mandate, Plaintiffs proceed as follows: First, they point out that the claims are, in fact, unrelated to *Whitford*. Next, they show that the bulk of the claims are not new either. As to these recycled claims, Plaintiffs do not engage with them substantively, but rather identify where they were previously made, where Plaintiffs responded to them—and where this Court, too, refuted them. Lastly, as to the smattering of genuinely new claims, Plaintiffs do rebut them in full, notwithstanding their lack of a connection to *Whitford*.

This Court should therefore deny the Assembly's motion to dismiss. To prevent the proceedings from being derailed, the Court should also insist that the parties focus on issues within the scope of the Supreme Court's remand.

## BACKGROUND

This Court is already familiar with the course of this litigation through the Court's opinions on the merits, dkt. 166, and on remedies, dkt. 182. In this background section, Plaintiffs thus begin with the Supreme Court's decision in *Whitford*. Three developments in *Whitford* are significant on remand: first and foremost, the Court holding about partisan vote dilution standing; second, the reasonable inference that a test for partisan vote dilution should be district-specific; and third, Justice Kagan's articulation of a distinct associational theory of partisan gerrymandering.

After summarizing *Whitford*, Plaintiffs explain how their activities since the decision have responded to these developments. As to standing, they have added numerous individual voters as litigants and assembled evidence from expert witnesses that these voters are unnecessarily cracked or packed by Act 43. As to a district-specific test for partisan vote dilution, Plaintiffs have both formulated such a standard and compiled evidence enabling partisan intent to be found for each district where an individual Plaintiff resides. And as to an associational claim, Plaintiffs have pled

this theory, proposed a standard for adjudicating it, and amassed evidence confirming the associational harms caused by Act 43.

## I.    The Supreme Court's Decision in Whitford

### A.    Partisan Vote Dilution Standing

In *Whitford*, the Supreme Court resolved the ambiguity that had existed as to who has standing to sue on partisan vote dilution grounds. The Court unanimously held that only plaintiffs living in cracked or packed districts—and so *not* all supporters of the victimized party—have standing. As the Court put it, a vote dilution plaintiff must "prove that he or she lives in a cracked or packed district." 138 S. Ct. at 1932. Or in the words of Justice Kagan's concurrence, "a plaintiff asserting a partisan gerrymandering claim based on a theory of vote dilution must prove that she lives in a packed or cracked district in order to establish standing." *Id.* at 1934 (Kagan, J., concurring).

Both the Court and Justice Kagan also required proof of cracking or packing *relative to another district configuration*. Plaintiffs living in cracked or packed districts, in other words, must show that they could have been uncracked or unpacked by a different map. The Court explained that the "harm" of vote dilution arises when a plaintiff's vote, "having been packed or cracked . . . carr[ies] less weight than it would carry in another, hypothetical district." *Id.* at 1931. Justice Kagan elaborated that, to "prov[e] packing or cracking, a plaintiff could produce an alternative map (or set of alternative maps)—comparably consistent with traditional districting principles—under which her vote would carry more weight." *Id.* at 1936 (Kagan, J., concurring). "For example, a Democratic plaintiff living in a 75%-Democratic district could prove she was packed by presenting a different map, drawn without a focus on partisan advantage, that would place her in a 60%-Democratic district." *Id.* "Or conversely, a Democratic plaintiff residing in a 35%-

Democratic district could prove she was cracked by offering an alternative, neutrally drawn map putting her in a 50-50 district." *Id.*

This approach to standing raises a number of subsidiary issues, which the Court and Justice Kagan addressed at well. *First*, what does it mean for a district to be "cracked" or "packed"? "'Cracking,'" according to the Court, "'means dividing a party's supporters among multiple districts so that they fall short of a majority in each one.'" *Id.* at 1924; *see also id.* at 1935 (Kagan, J., concurring) (cracking is "spreading [voters] sufficiently thin to prevent them from electing their preferred candidates"). "'Packing,'" in turn, "'means concentrating one party's backers in a few districts that they win by overwhelming margins.'" *Id.* at 1924; *see also id.* at 1935 (Kagan, J., concurring) (packing is creating "supermajorities of [a party's] voters—well beyond the number needed for [their] candidate to prevail").

*Second*, how should plaintiffs show that they are unnecessarily cracked or packed? Both the Court and Justice Kagan stressed "hypothetical," *id.* at 1931, or "alternative," *id.* at 1936 (Kagan, J., concurring), district maps. Justice Kagan added that these maps should be "comparably consistent with traditional districting principles" and "drawn without a focus on partisan advantage." *Id.* Maps that rely on bizarrely shaped districts to gerrymander in favor of the claimants' party would therefore be unacceptable as baselines for comparison. Beyond these points, though, plaintiffs appear to have significant flexibility in the evidence they present. They could offer a single hypothetical map or a "set of alternative maps." *Id.* These maps could be drawn by hand or through "computer simulation techniques for devising alternative maps." *Id.* And "other ways of proving packing or cracking" might exist too. *Id.*

*Third*, how does a hypothetical map uncrack or unpack plaintiffs? It undoes cracking— dispersing the opposing party's voters so that the line-drawing party wins a particular district—by flipping the district from the line-drawing party to the opposing party (or at least significantly

bolstering the opposing party's chances). *See id.* ("a Democratic plaintiff residing in a 35%-Democratic district" could submit a "map putting her in a 50-50 district"). Analogously, an alternative map negates packing—overconcentrating the opposing party's voters in a given district—by making the district somewhat less safe for the opposing party. *See id.* ("a Democratic plaintiff living in a 75%-Democratic district" could present a map "that would place her in a 60%-Democratic district").

And *fourth*, in how many of a State's districts would plaintiffs typically be able to establish standing? "It all depends on how much . . . packing and cracking . . . the mapmakers have done." *Id.* at 1937. If the degree of vote dilution is minor, then only plaintiffs in a few districts may have been unnecessarily cracked or packed. But "[s]uppose that mapmakers pack or crack a critical mass of . . . districts all across the State to elect as many [of the line-drawing party's] politicians as possible." *Id.* Then plaintiffs could "join[] together" and "attack[] all the packed and cracked districts in a statewide gerrymander," resulting in "a wholesale restructuring of the State's districting plan." *Id.*; *see also id.* at 1931 (observing that plaintiffs could establish standing in enough areas to "require restructuring all of the State's legislative districts").

## B.    A District-Specific Claim

While *Whitford*'s only explicit holding was about standing, it is also reasonable to infer from the decision that any test for partisan vote dilution should be district-specific. Any such test, that is, should proceed district by district and should be capable of invalidating certain districts while upholding others. This is so, most plainly, because of the Supreme Court's approach to standing. Since the standing inquiry is district-specific—asking whether a particular district is unnecessarily cracked or packed—it would be incongruous for the merits analysis then to be entirely plan-wide. To put the point another way, standing necessarily "'turns on the nature and source of the claim asserted.'" *Id.* at 1938 (Kagan, J., concurring) (quoting *Warth v. Seldin*, 422

U.S. 490, 500 (1975)). Thus if standing is limited to a plaintiff's own district, then that is the only district against which the plaintiff should be able to assert a claim.

The Court's remarks about remedies support this interpretation. According to the Court, "the remedy that is proper and sufficient" for partisan vote dilution "lies in the revision of the boundaries of the individual's own district." *Id.* at 1930. "Remedying the individual voter's harm . . . . requires revising only such districts as are necessary to reshape the voter's district—so that the voter may be unpacked or uncracked, as the case may be." *Id.* at 1931. Again, a district-specific remedy is sensible only if the cause of action is district-specific too. It would be odd for the claim to be plan-wide but for violations to be cured district by district.

Justice Kagan's comments about discriminatory intent provide further confirmation. She explained that "evidence about the mapmakers' goals in formulating the entire statewide map . . . would predictably carry down to individual districting decisions." *Id.* at 1937 (Kagan, J., concurring). She also analogized partisan vote dilution to the racial gerrymandering context, where the "Court has explicitly recognized the relevance of such statewide evidence in addressing . . . claims of a district-specific nature." *Id.* Once more, this discussion makes sense only if the test for partisan vote dilution applies to a particular district. If the test instead applied to a map in its entirety, then it would be plan-wide (not district-specific) intent that would have to be shown.

None of this means, however, that *every element* of a partisan vote dilution claim must be district-specific. The test that Plaintiffs outline below has a district-specific component and a subsequent plan-wide stage. *See infra* Background II.B. The plan-wide stage limits liability by preventing districts from being struck down when they do not belong to dilutive maps. It thus plays the same role as analogous plan-wide analyses in one person, one vote and racial vote dilution cases. *See infra* Argument II.B.

10

### C.    The Associational Theory

The last major development in *Whitford* was Justice Kagan's presentation of a distinct associational theory of partisan gerrymandering. On this account, gerrymandering is unconstitutional not only because it dilutes the electoral influence of targeted voters, but also because it burdens the associational rights of these voters and their preferred party. Several points about this theory are worth flagging. *First*, it is entirely a First Amendment claim, not one (like partisan vote dilution) that captures both free speech and equal protection concerns. It thus builds on "the theory of harm advanced by Justice Kennedy in *Vieth* [*v. Jubelirer*, 541 U.S. 267 (2004)]," where he "explained the First Amendment associational injury deriving from a partisan gerrymander." *Whitford*, 138 S. Ct. at 1938, 1940 (Kagan, J., concurring).

*Second*, the associational theory is conceptually separate from partisan vote dilution. The constitutional harm it recognizes is *not* the reduction of certain voters' electoral sway due to the configuration of district boundaries. Rather, it is the associational burdens that these voters (and their preferred party) suffer: their "difficulties fundraising, registering voters, attracting volunteers, generating support from independents, and recruiting candidates to run for office (not to mention eventually accomplishing their policy objectives)." *Id.* at 1938. These burdens, however, do arise because of the district plan's effect on the targeted party's representation. They accrue, that is, because the targeted party is "ravaged" and "deprived of [its] natural political strength by [the] partisan gerrymander." *Id.* Accordingly, partisan vote dilution is not the relevant *injury* here, but it is typically the *mechanism* through which associational burdens are imposed.

*Third*, individual voters are not the only litigants who may assert infringements of their associational rights. Party representatives and party organizations may do so as well, and indeed, may often have even more compelling claims thanks to their more extensive participation in party associational activities. In Justice Kagan's words, "what is true for party members"—the

11

associational burdens they endure—"may be doubly true for party officials and triply true for the party itself (or for related organizations)." *Id.*

*Fourth*, every aspect of an associational suit is plan-wide, not district-specific, in nature. Because "[t]he complaint in such a case is . . . that the gerrymander has burdened the ability of like-minded people across the State to affiliate in a political party and carry out that organization's activities and objects," "the relevant standing requirement" is "statewide." *Id.* at 1939. Similarly, just as the merits analysis and the proper remedy are district-specific in a partisan vote dilution suit (because standing is district-specific), they are plan-wide in an associational challenge. "[W]hen the suit alleges that a gerrymander has imposed those [associational] burdens on a statewide basis, then its litigation should be statewide too—as to standing, liability, and remedy alike." *Id.* at 1940.

*Finally*, Justice Kagan explicitly contemplated that Plaintiffs would mount an associational claim in the wake of *Whitford*. "[N]othing in the Court's opinion prevents the plaintiffs on remand from pursuing an associational claim, or from satisfying the different standing requirement that theory would entail." *Id.* at 1939.

## II.   Plaintiffs' Compliance with *Whitford*'s Mandate

### A.   Partisan Vote Dilution Standing

Since *Whitford*, Plaintiffs have diligently addressed all of the three—and only the three—areas within the scope of the Supreme Court's mandate.[4] With respect to partisan vote dilution standing, Plaintiffs have added twenty-eight more individual voters as litigants. Dkt. 201 ¶¶ 16-111. Plaintiffs have also explained in their amended complaint why each individual voter who asserts standing on this basis in fact possesses it. Each such voter "support[s] the election of

---

[4] As noted above, Plaintiffs have simultaneously filed for the Court's consideration a redlined version of their amended complaint in the *Whitford* case, showing that the non-cosmetic changes to the original complaint filed in *Whitford* involve only areas within the scope of the Supreme Court's mandate. Case No. 15-cv-421-jdp, dkt. 228-1; Case No. 18-cv-763-jdp, dkt. 30-1.

Democratic candidates and the implementation of Democratic policies." *Id.* ¶ 16. Each such voter, furthermore, lives in a district that *was* "cracked or packed by [Act 43], but that did not *have* to be cracked or packed, as demonstrated by an alternative map generated by a computer algorithm without consideration of partisan data." *Id.* Thus, for each such voter, "the particular composition of the voter's own district . . . causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." *Whitford*, 138 S. Ct. at 1931.

The "alternative map" referred to above was created by Plaintiffs' expert, Professor Jowei Chen. Professor Chen programmed his redistricting algorithm to match or beat Act 43 on all of its nonpartisan criteria: contiguity, equal population, respecting county boundaries, respecting municipal boundaries, constructing majority-black and majority-Latino districts, and avoiding pairing incumbents.[5] Of the thousands of resulting maps, Professor Chen then narrowed the set to only those that treat the major parties nearly perfectly symmetrically, based on the same partisan data used by Act 43's drafters. Of these, Simulated Map 43995 has, on average, the most compact districts. Dkt. 220-1, at 2-9.[6]

In particular, Simulated Map 43995 has the same total population deviation as Act 43 (248 persons) and the same numbers of majority-black and majority-Latino districts (6 and 1, respectively). *Id.* at 14. But Simulated Map 43995 splits 15 fewer counties than Act 43 (43 versus 58), splits 14 fewer municipalities (53 versus 67), pairs 4 fewer incumbents (18 versus 22), and has substantially more compact districts (average Reock score of 0.402 versus 0.375). *Id.* Simulated Map 43995 also has an efficiency gap of almost exactly zero, again using the Act 43 drafters' own preferred measure of partisanship. *Id.* Simulated Map 43995 is thus the kind of

---

[5] Plaintiffs do not concede that incumbent protection is a nonpartisan criterion; indeed, it is often a key technique through which a gerrymander is constructed. Professor Chen nevertheless included the criterion in an abundance of caution.

[6] The Assembly filed Professor Chen's and Professor Kenneth Mayer's expert reports along with its reply brief in support of its motion to intervene.

hypothetical map that Justice Kagan anticipated in *Whitford*: one that is "drawn without a focus on partisan advantage," that is "comparably consistent with traditional districting principles," and that simultaneously uncracks or unpacks all of the plaintiffs who assert standing. *Whitford*, 138 S. Ct. at 1936 (Kagan, J., concurring).

Of the more than two dozen individual voters who are uncracked or unpacked by Simulated Map 43995, Plaintiffs mention just two examples here. (The rest are described in Plaintiffs' amended complaint and in Professor Chen's expert report.) Warren Braun, then, is a Democratic voter who currently lives in District 13. Dkt. 201 ¶¶ 24-25. As displayed below, District 13 "extend[s] from (more Democratic) Milwaukee County into (more Republican) Waukesha County," and "was expected to have a Republican vote share of 60%" by Act 43's drafters. *Id.* ¶ 25; *see also id.* (noting that Act 43's drafters labeled District 13 a "Statistical Pick Up"). In Simulated Map 43995, on the other hand, Braun is placed in District 40. Dkt. 220-1, at 41. District 40 does *not* breach the border between Milwaukee and Waukesha Counties, has an expected Democratic vote share of 53%, and thus uncracks Braun and similarly situated Democratic voters. *Id.*





Likewise, Linea Sundstrom is a Democratic voter who currently lives in District 10. Dkt. 201 ¶¶ 21-22. As shown below, District 10 is "located mostly in Milwaukee," "contains many of that city's Democratic voters," and "was expected to have a Democratic vote share of 86%" by Act 43's drafters. *Id.* ¶ 22. In Simulated Map 43995, however, Sundstrom is placed in District 5. Dkt. 220-1, at 65. District 5 remains entirely within Milwaukee County, has an expected Democratic vote share more than *twenty points* lower, and thus unpacks Sundstrom and similarly situated Democratic voters. *Id.*




Evidence of this kind is how Plaintiffs intend to prove standing for each individual voter who alleges partisan vote dilution. Such evidence, again, establishes that the voter is currently cracked or packed, and could be uncracked or unpacked by a non-gerrymandered plan like Simulated Map 43995. This is precisely the showing the Supreme Court required in *Whitford*.

### B.   A District-Specific Claim

Turning from standing to the merits of a partisan vote dilution claim, Plaintiffs propose a district-specific discriminatory intent requirement that would precede the plan-wide discriminatory effect and justification prongs this Court previously adopted. To satisfy this requirement, a particular district would have to be drawn *purposefully* to crack or pack the targeted party's voters and thus to dilute their electoral influence. Unless the requirement were satisfied, no

16

district could be invalidated, no matter how objectionable the plan to which it belongs might be. Liability, that is, would attach to the individual district, not the overall map.

Of course, as Justice Kagan pointed out in her *Whitford* concurrence, statewide partisan intent is highly probative of district-specific partisan intent. "[T]he mapmakers' goals in formulating the entire statewide map . . . predictably carry down to individual districting decisions." 138 S. Ct. at 1937 (Kagan, J., concurring). But statewide material may also be supplemented by information about particular districts. For example, the line-drawers may have created tables revealing the vote shares they expected the parties to receive in each district. Or the line-drawers may have described certain districts in terms that expose their partisan motivation. Or the line-drawers' aims may be inferred by examining how their districts disperse or concentrate the opposing party's voters.

Here, Plaintiffs intend to use all of these forms of evidence to prove district-specific partisan intent for each district they challenge on partisan vote dilution grounds. As this Court has already held, after exhaustively describing the enactment of Act 43, "one of [its] purposes . . . was to secure Republican control of the Assembly under any likely future electoral scenario for the remainder of the decade, in other words to entrench the Republican Party in power." Dkt. 166, at 71. This statewide purpose "predictably carr[ies] down" to the "individual districting decisions" that Plaintiffs dispute. *Whitford*, 138 S. Ct. at 1937 (Kagan, J., concurring).[7]

Additionally, Act 43's drafters left behind tables in which they stated how they thought each party would perform in each of the plan's districts. Dkt. 201 ¶¶ 18-104. These tables provide detailed quantitative data about how cracked or packed the drafters believed each challenged district to be. Even more explicitly, the drafters used phrases like "Statistical Pick Up," a "GOP seat" that was "strengthened" or "strengthened a lot," a "Currently held DEM seat" that was

---

[7] Because this Court's findings about Act 43's statewide partisan purpose remain so highly probative, the Court should *supplement* them on remand with district-specific intent findings, but certainly should not *delete* them.

"weakened," and a "pairing" of "dem" and "dem" incumbents, to refer to certain districts. *Id.* This language is as close to a smoking gun as is ever likely to be found in a partisan vote dilution case. Lastly, Professor Kenneth Mayer's expert report explains in meticulous detail how each disputed district achieves its cracking or packing—and how the cracking or packing could have been avoided while still complying with traditional districting principles. Dkt. 220-2, at 13-40. This is powerful circumstantial evidence that further corroborates district-specific partisan intent for each district attacked on the basis of partisan vote dilution. *Cf.* dkt. 166, at 128 (Griesbach, J., dissenting) (requesting the production of "district maps demonstrating the gerrymander [the plaintiffs] alleged occurred").

Only at this point, under Plaintiffs' proposal, would this Court's plan-wide discriminatory effect and justification prongs become applicable. Only if a litigant shows that her district was deliberately cracked or packed, that is, would it be relevant if the map as a whole exhibits a large and durable partisan asymmetry, or if the State can persuasively justify this asymmetry. These plan-wide elements would be analyzed exactly as the Court addressed them in its post-trial opinion.

The magnitude of a plan's discriminatory effect could thus be determined using expected and actual election results, dkt. 166, at 74-75, as well as social scientific measures of partisan asymmetry like the efficiency gap, partisan bias, and the mean-median difference, *id.* at 80-90. The durability of a plan's discriminatory effect, in turn, could be evaluated through sensitivity testing: swinging observed election results by several points in each party's direction and then estimating each party's performance given each incremental shift. *Id.* at 75-80, 83-84. And alternative maps could illuminate whether any legitimate justification, like political geography or compliance with traditional districting principles, exists for the enacted plan's discriminatory effect. These alternative maps could include the line-drawers' own drafts, plans used by the

18

jurisdiction in previous cycles, and demonstration maps created either by hand or through a computer algorithm. *Id.* at 103-11.

Lastly, under Plaintiffs' proposal, the remedy for partisan vote dilution would be district-specific. "[O]nly such districts as are necessary to reshape the voter's district—so that the voter may be unpacked or uncracked, as the case may be" would be altered. *Whitford*, 138 S. Ct. at 1931. Here, for example, Plaintiffs challenge only twenty-seven of Act 43's ninety-nine districts on partisan vote dilution grounds. Dkt. 201 ¶¶ 18-104. Thus only these districts could be invalidated on this basis (though the State would undoubtedly have to revise other districts, too, to cure the violations).

### C.   The Associational Theory

Plaintiffs' final response to *Whitford* has been to accept Justice Kagan's invitation and to plead and prove separately an associational theory of partisan gerrymandering. This associational claim is now included as a second count in Plaintiffs' amended complaint. *Id.* ¶¶ 173-78. It is also the only count in the ADCC's complaint. Case No. 18-cv-763-jdp, dkt. 1 ¶¶ 33-39.

While Justice Kagan did not announce a standard for associational challenges, she did cite several Supreme Court cases that have adjudicated such claims (in contexts other than partisan gerrymandering). *See Whitford*, 138 S. Ct. at 1938, 1940 (Kagan, J., concurring) (citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Cal. Democratic Party v. Jones*, 530 U.S. 567 (2000)). Under these cases, a policy is not automatically unconstitutional if it burdens party supporters' associational rights. Rather, "the rigorousness of [the] inquiry into the propriety of a state election law depends upon the extent to which [it] burdens First and Fourteenth Amendment rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also Anderson*, 460 U.S. at 789 (a court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments"). "[W]hen those rights are subjected to severe restrictions, the

regulation must be narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (internal quotation marks omitted). "But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (internal quotation marks omitted).

This framework, often referred to as *Anderson-Burdick* balancing, is distinctive in several respects. *First*, it does not explicitly require discriminatory intent to be shown. However, the motivation of the policymaker still enters the analysis because "*non*discriminatory restrictions"— those that do not aim to burden party supporters' associational rights—are typically upheld. *Id.* (emphasis added). *Second*, the stringency of judicial scrutiny is not static, but rather varies in tandem with the severity of the associational burdens. Mild burdens thus result in something like rational basis review, while more onerous impositions prompt more searching, even strict, scrutiny.

*Third*, in a partisan gerrymandering case, the associational burdens are likely to be correlated with the magnitude and durability of a plan's discriminatory effect. It is more plausible, in other words, that party supporters' associational rights have been severely infringed when a plan is highly and persistently asymmetric than when it is reasonably balanced. This is why Justice Kagan commented that "plaintiffs' evidence of partisan asymmetry well fits a suit alleging associational injury." *Whitford*, 138 S. Ct. at 1939 (Kagan, J., concurring). "[W]hat those statistical metrics best measure is a gerrymander's effect 'on the fortunes of political parties' and those associated with them." *Id.*

And *fourth*, when the associational burdens imposed by a district plan are substantial, judicial scrutiny looks much like the justification stage of this Court's three-pronged test for partisan vote dilution. As at that stage, it becomes necessary to identify "state interest[s] of

compelling importance," *Burdick*, 504 U.S. at 434—that is, legitimate, nonpartisan redistricting criteria with which the jurisdiction sought to comply. Also as at that stage, "the regulation must be narrowly drawn to advance" these interests. *Id.* (internal quotation marks omitted). There must thus be a tight fit between the district map and its valid objectives. There must *not* be many alternative district configurations that would equally (or better) achieve these goals while levying far lighter associational burdens.

Here, all forty individual plaintiffs allege that their associational rights have been unjustifiably burdened by Act 43. Because of it, "[t]hey have been deterred from, and hindered in, turning out to vote, registering voters, volunteering for campaigns, donating money to candidates, running for office, appealing to independents, and advocating and implementing their preferred policies." Dkt. 201 ¶ 17. Plaintiffs intend to substantiate these allegations through testimony and documentary evidence from these individual voters.

Likewise, the ADCC—the party organization representing Assembly Democratic members and candidates—asserts in its complaint (and will prove at trial) that, due to Act 43, it has been "impaired in the performance of virtually all of [its] associational functions." Case No. 18-cv-763-jdp, dkt. 1 ¶ 2. The Assembly Democrats "have found it harder to raise money." *Id.* "Fewer volunteers have joined their campaigns." *Id.* "They have encountered more resistance among independent voters while campaigning." *Id.* "Recruitment of candidates has become more difficult." *Id.* "And condemned to the legislative minority for the whole decennial cycle, the Assembly Democrats have not been able to enact their preferred policies." *Id.*; *see also id.* ¶¶ 26-32 (developing these points more fully).

Both the individual voters' and the ADCC's allegations are confirmed by Professor Mayer's expert report. He first explains, as a theoretical matter, why a party "deprived of [its] natural political strength by a partisan gerrymander," *Whitford*, 138 S. Ct. at 1938 (Kagan, J.,

21

concurring), would suffer an array of associational harms. Dkt. 220-2, at 4-8. He then documents these harms with evidence from before and after Act 43's enactment. Democratic Assembly candidates have raised less money than their Republican counterparts in elections held under Act 43. *Id.* at 9. The number of Assembly seats uncontested by Democratic candidates has spiked in these elections. *Id.* at 10. The proportions of Wisconsin Democrats who attend political meetings, put up political signs, donate money to candidates, or volunteer for campaigns have slumped. *Id.* at 11. And enacted policy has moved sharply to the right; indeed, "[t]he overall change from 2010 to 2014 is the largest 4-year conservative shift . . . in Wisconsin since the 1930s." *Id.* at 12.

## STANDARD OF REVIEW

A motion to dismiss must be denied if a plaintiff's complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court must "accept all facts in the complaint as true," "view them in the light most favorable to the [plaintiffs]," and "draw all reasonable inferences in their favor." *Id.* "[T]he bar to survive a motion to dismiss is not high." *Id.*; *see also, e.g.*, *Indep. Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012) ("[A] plaintiff's claim need not be probable, only plausible . . . ."); *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012) ("Complaints need not anticipate defenses and attempt to defeat them.").

## ARGUMENT

In the wake of the Supreme Court's decision in *Whitford*, one might have expected the Assembly to raise arguments within the scope of the Court's mandate. As discussed above, that is what Plaintiffs did. *See supra* Background II. That is also what this Court *instructed* the parties to do. *See* dkt. 199, at 1-2 (urging "the expeditious resolution of this case within the mandate of the Supreme Court"). Unfortunately, the Assembly chose a different route. It filed an eighty-two-page

motion-to-dismiss brief, very little of which has anything to do with *Whitford*. Instead, most of the brief recycles claims this Court has previously analyzed at length and then rejected, in conclusions undisturbed by the Supreme Court's ruling.

The Assembly's odd litigation strategy thus compels Plaintiffs first to explain why this Court need not and should not engage with arguments beyond the scope of the Supreme Court's mandate. The mandate rule, the law of the case, and past practice in redistricting cases all support this approach. Next, Plaintiffs respond to the Assembly's few contentions that plausibly pertain to *Whitford*. Notably, these contentions do *not* include any claim about standing, even though that was the sole topic as to which the Supreme Court reached an explicit holding. And last, Plaintiffs refute the Assembly's many claims that are entirely unrelated to *Whitford*. As to most of these extraneous claims, this Court has already supplied the definitive rebuttal; as to a few of them, Plaintiffs identify their flaws.

## I.   This Court Need Not and Should Not Address Arguments Beyond the Scope of the Supreme Court's Mandate.

### A.   The Mandate Rule

The familiar mandate rule provides the first reason why this Court should refuse to address the Assembly's arguments that lie beyond the scope of the Supreme Court's mandate. Under this rule, "a lower court [must] adhere to the commands of a higher court on remand." *United States v. Polland*, 56 F.3d 776, 777 (7th Cir. 1995); *see also, e.g.*, *United States v. White*, 406 F.3d 827, 831 (7th Cir. 2005) ("[T]he mandate rule require[s] the district court to adhere to the commands of this Court."). To ascertain these commands, a lower court must perform "a careful reading of the reviewing court's opinion." *Creek v. Vill. of Westhaven*, 144 F.3d 441, 445 (7th Cir. 1998); *see also, e.g.*, *Moore v. Anderson*, 222 F.3d 280, 283 (7th Cir. 2000) (requiring the district court "[t]o determine what issues were actually decided by the mandate"). And once the commands have been established, a lower court must "confine its discussion to the issues remanded." *United States v.*

*Morris*, 259 F.3d 894, 898 (7th Cir. 2001); *see also, e.g.*, *Kovacs v. United States*, 739 F.3d 1020, 1024 (7th Cir. 2014) ("A court to which a case has been remanded may address only the issue or issues remanded . . . ."); *United States v. Husband*, 312 F.3d 247, 250 n.3 (7th Cir. 2002) (observing "[t]he general principle that the district court can only hear [arguments] within the scope of the remand").

Here, the Supreme Court remanded this case for one explicit purpose: allowing Plaintiffs to "demonstrate standing in accord with the analysis in this opinion." *Whitford*, 138 S. Ct. at 1923; *see also id.* at 1934 ("We therefore remand the case to the District Court so that the plaintiffs may have an opportunity to prove concrete and particularized injuries . . . ."). Additionally, as noted above, *Whitford*'s holding that partisan vote dilution *standing* is district-specific suggests that *liability* should also be analyzed district by district when such claims are brought. *See supra* Background I.B. Articulating and applying a district-specific test for partisan vote dilution is therefore implicitly within *Whitford*'s mandate. And in her concurrence, Justice Kagan presented an associational theory of partisan gerrymandering and remarked that "nothing in the Court's opinion prevents the plaintiffs on remand from pursuing an associational claim." *Whitford*, 138 S. Ct. at 1939 (Kagan, J., concurring); *see also id.* at 1934 ("[O]n remand [Plaintiffs] may well develop the associational theory . . . ."). This is the third and final issue the Court expected the parties to litigate on remand.

Under the mandate rule, then, the Supreme Court's commands are clear: In the wake of *Whitford*, the parties should address (1) partisan vote dilution standing; (2) how to state and implement a district-specific test for partisan vote dilution; and (3) the associational theory of partisan gerrymandering. This Court, too, should limit its efforts to these three subjects. All other matters are "not within the scope of the remand," and so "not available for consideration on

remand." *Husband*, 312 F.3d at 251, 252. The Assembly "cannot use the accident of remand as an opportunity to reopen" those superfluous issues. *Morris*, 259 F.3d at 898.

### B.     The Law of the Case

The law of the case doctrine leads to the same conclusion. This doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Arizona v. California*, 460 U.S. 605, 618 (1983). The doctrine thus "promotes the finality and efficiency of the judicial process by protecting against the agitation of settled issues." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (internal quotation marks omitted). It further "preclude[s] parties from contesting matters that they have had a full and fair opportunity to litigate," "protects their adversaries from the expense and vexation attending multiple" proceedings, "conserves judicial resources," and "fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153, 154 (1979).

It is true, of course, that when a lower court's judgment is vacated, its earlier rulings are not *dispositive* in later stages of the litigation. While "not directly binding," however, these rulings do remain "the most pertinent statement of the governing law." *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 646 (1979) (Powell, J., dissenting). They "continue to have precedential weight" and are "persuasive authority if not the governing law." *Id.* at 646 n.10. The Seventh Circuit recognized this rule in *Pearson v. Edgar*, 153 F.3d 397, 405 (7th Cir. 1998), after "the Supreme Court vacated [its] entire [earlier] judgment." That judgment "still establishe[d] the law of the case on [the issues of] equal protection and vagueness," because the Supreme Court's decision "did not affect either of those areas of the law." *Id.*

The Seventh Circuit confirmed the continuing relevance of rulings vacated for other reasons in *Christianson v. Colt Indus. Operating Corp.*, 870 F.2d 1292 (7th Cir. 1989). The

Supreme Court "vacated the Federal Circuit's decision on the ground that . . . it did not have jurisdiction." *Id.* at 1298. Nevertheless, "although vacated, the decision stands as the most comprehensive source of guidance available on the . . . questions at issue." *Id.* The Seventh Circuit thus declined to "stray[] from the [Federal Circuit's] thorough analysis of the difficult issues presented." *Id.* at 1299; *see also, e.g.*, *United States v. M.C.C. of Fla.*, *Inc.*, 967 F.2d 1559, 1562 (11th Cir. 1992) ("A vacation which merely requires further consideration in light of a new Supreme Court decision . . . . [does not] nullify all prior proceedings."); *In re Evanston Nw. Corp. Antitrust Litig.*, No. 07–cv–04446, 2013 WL 6490152, at *3 (N.D. Ill. Dec. 10, 2013) ("Although the Seventh Circuit vacated the previous order . . . . its vacatur had nothing to do with the merits of the prior order's analysis . . . . [and] did not disturb the previous findings . . . .").

Under the law of the case doctrine, then, this Court has no obligation to revisit its earlier rulings that were unaffected by the Supreme Court's decision in *Whitford*. These rulings do not *bind* this Court, but they are still highly persuasive conclusions that may freely be reinstated. To put the point another way, the mere fact of vacatur does not strip this Court's previous determinations of all their authority. Rather, to the extent these determinations are untouched by *Whitford*, they remain the most cogent available treatments of the relevant issues.

## C.    Past Redistricting Practice

Together, the mandate rule and the law of the case hold that when district courts' judgments in redistricting suits are vacated, the courts should limit their activities on remand to matters implicated by the Supreme Court's intervening decision. They need not reconsider other aspects of their original holdings. In an array of recent partisan and racial gerrymandering cases, it turns out, this is exactly the approach that district courts have taken. They have not restarted the litigation from scratch, but rather filled in the specific gaps identified by the Supreme Court.

Take the case most similar to this one: the partisan gerrymandering challenge to North Carolina's congressional plan, which led to the plan's invalidation in January 2018 based on the same types of empirical evidence introduced here. *See Common Cause v. Rucho*, 279 F. Supp. 3d 587 (M.D.N.C. 2018) (*Common Cause I*). The Supreme Court vacated the district court's judgment in June 2018 for "further consideration in light of" *Whitford*. *Rucho v. Common Cause*, 138 S. Ct. 2679, 2679 (2018). On remand, the district court did precisely what Plaintiffs advocate in this case. It separately analyzed the litigants residing in each district to determine if they had standing to allege partisan vote dilution. *See Common Cause v. Rucho*, 318 F. Supp. 3d 777, 821-26 (M.D.N.C. 2018) (*Common Cause II*). It examined whether each district in which plaintiffs had standing was designed with district-specific partisan intent. *See id.* at 901-23. It fleshed out the associational theory of partisan gerrymandering discussed in Justice Kagan's *Whitford* concurrence. *See id.* at 926-27. And that is *all* the district court did; in every other area, *Common Cause II* simply restated the court's rulings in *Common Cause I*. *See id.* at 814 (noting that *Whitford* "does not call into question [these] earlier conclusions").

Or consider the lone case cited by the Supreme Court in *Whitford* in remanding this matter: *Alabama Legislative Black Caucus v. Alabama*, 135 S. Ct. 1257 (2015). As the *Whitford* Court observed, its vacatur and remand in *Alabama Legislative Black Caucus* were for "further consideration of the plaintiffs' [racial] gerrymandering claims on a district-by-district basis." *Whitford*, 138 S. Ct. at 1934. Sure enough, that was the only topic the district court subsequently tackled. The court heard extensive evidence and arguments about these district-specific claims. *See Ala. Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1043 (M.D. Ala. 2017). But the court otherwise "readopted [its] earlier findings of fact and conclusions of law to the extent that the Supreme Court did not address them." *Id.* And when a party "moved for reconsideration of [these] previous orders," the court "denied that motion." *Id.*

*Alabama Legislative Black Caucus*, moreover, is par for the course in recent racial gerrymandering litigation. In *Bethune-Hill v. Virginia State Board of Elections*, 137 S. Ct. 788, 802 (2017), for instance, the Supreme Court vacated the district court's judgment with respect to eleven of twelve challenged districts, and remanded so the court could apply the correct legal "principles to the remaining 11 districts." That (and only that) is what the court did on remand: engage in "reconsideration of the question whether race was used as the predominant factor in drawing the 11 remaining districts." *Bethune-Hill v. Va. State Bd. of Elections*, 326 F. Supp. 3d 128, 137 (E.D. Va. 2018). In *North Carolina v. Covington*, 137 S. Ct. 1624, 1626 (2017), likewise, the Supreme Court vacated the district court's remedy for unlawful racial gerrymandering and remanded for further proceedings. Once more, the court restricted its efforts on remand to "invit[ing] the parties to provide evidence, briefing, and argument regarding all issues relevant to remedying the constitutional violation." *Covington v. State*, 267 F. Supp. 3d 664, 665 (M.D.N.C. 2017).

Nor is there anything distinctive about a vacatur for lack of standing (rather than some other legal flaw). The absence of plaintiffs with standing is why the Supreme Court vacated and remanded the district court's judgment in the racial gerrymandering case of *United States v. Hays*, 515 U.S. 737, 747 (1995). On remand, the court "permitted the plaintiffs to file an amended complaint, adding as plaintiffs residents of" the disputed district. *Hays v. Louisiana*, 936 F. Supp. 360, 365 (W.D. La. 1996). The court also noted that "[a]n extensive record had been developed previously," and "adopt[ed] the prior record in the current proceedings." *Id.* at 367. Reinstating this record was appropriate because the matter "had been remanded by the Supreme Court on grounds entirely unrelated to the merits of the case, leaving [the court] with no reason to doubt that the prior record was more than sufficient for a proper legal determination of the issues involved." *Id.*

28

Accordingly, past practice in redistricting suits is entirely consistent with the mandate rule and the law of the case. After their judgments have been vacated by the Supreme Court, district courts have focused exclusively on the areas unsettled by the Court's decision. They have never done what the Assembly now recommends: treat the Court's vacatur for *certain* reasons as an invitation to reopen every *other* issue in the case.

## II. This Court Should Reject the Assembly's Arguments That Are Within the Scope of the Supreme Court's Mandate.

### A. Partisan Vote Dilution Standing

Plaintiffs turn next to the Assembly's few arguments that lie within the scope of the Supreme Court's mandate in *Whitford*. Notably, these arguments do not include any claim about partisan vote dilution standing: the one subject as to which the Court reached an explicit holding. The Assembly states in a footnote that, down the road, it "plan[s] on asserting [that Plaintiffs] lack standing as an affirmative defense." Dkt. 225, at 39 n.118. But beyond this foreshadowing of a future assertion, the Assembly has nothing else to say about the matter. This silence on standing—in the context of an eighty-two-page brief that is not mute about much else—is itself indicative of how far the Assembly has strayed from *Whitford*.

### B. A District-Specific Claim

After standing, the formulation of a district-specific test for partisan vote dilution is the next topic covered by the Supreme Court's mandate. *See supra* Background I.B. The Assembly makes two arguments that plausibly relate to this topic. First, it asserts that Plaintiffs' proposed test is "*solely* dependent on statewide partisan effect because that is all the plaintiffs' standard— the efficiency gap—measures." *Id.* at 38; *see also, e.g.*, *id.* at 66 (criticizing this Court's test for allegedly recognizing a "group right of a political majority [to] have a legislative majority"). Second, the Assembly maintains that the Supreme Court's decision in *Whitford* bars a partisan vote dilution test from relying in any way on plan-wide discriminatory effect. *See, e.g.*, *id.* at 37-

39; *id.* at 66-67 (*Whitford* "appears to exclude *any* vote dilution claim . . . on the basis of statewide results").

To begin with, the Assembly misstates Plaintiffs' proposed test, likely because it remains fixated on Plaintiffs' original complaint and ignores the position they actually took as the litigation unfolded. In fact, as discussed in detail earlier, Plaintiffs now advocate a standard that is district-specific as to standing, liability, and remedy alike. *See supra* Background II.B. Under this standard, each challenged district would be analyzed separately, and could be struck down only if it was drawn with partisan intent. *See id.*

Even before the Supreme Court's decision in *Whitford*, moreover, it was perfectly clear that Plaintiffs' proposed test and the efficiency gap are not one and the same. The efficiency gap is simply one of several measures of partisan asymmetry used by political scientists to evaluate district plans. It is thus one kind of evidence—along with other asymmetry metrics and expected and actual election results—that may be introduced to establish a plan's severe discriminatory effect. As Plaintiffs explained in their pretrial brief, they "do not ask the Court to embrace one measure to the exclusion of all others." Dkt. 134, at 51. Rather, "the Court could supplement the efficiency gap with partisan bias," "the mean-median difference," and other similar analyses. *Id.*; *see also*, dkt. 166, at 80 (concluding that evidence *other* than the efficiency gap "certainly makes a firm case on the question of discriminatory effect," and citing the efficiency gap only to "further bolster[]" that evidence).

The Assembly is therefore wrong that Plaintiffs' proposed test is—or ever was—"*solely* dependent on statewide partisan effect." Dkt. 225, at 38. The Assembly is also wrong that the Supreme Court's decision in *Whitford* somehow forbids any consideration of plan-wide discriminatory effect in a partisan vote dilution case. For one thing, the Court did not announce any such ban. It held that partisan vote dilution standing is district-specific, and it implied that

liability in such an action should also be assessed district by district. But it never held (or hinted) that *every element* of a partisan vote dilution claim must be district-specific too. To the contrary, the Court stated that evidence of plan-wide partisan intent "may well be pertinent with respect to any ultimate determination whether the plaintiffs may prevail in their claims." 138 S. Ct. at 1932. The Court also observed that "the efficiency gap and similar measures of partisan asymmetry" capture "the effect that a gerrymander has on the fortunes of political parties ." *Id.* at 1933.

Furthermore, if a partisan vote dilution claim included some district-specific and other plan-wide components, then it would resemble the two other types of vote dilution that courts have recognized: malapportionment and racial vote dilution. In a one person, one vote suit, a plaintiff must first make the district-specific showing that her own district is overpopulated. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 207-08 (1962) (holding that a plaintiff in an overpopulated district has standing because of her "position of constitutionally unjustifiable inequality vis-à-vis voters in irrationally favored" districts). The subsequent liability and remedy analyses, however, are both plan-wide. On the merits, the district map in its entirety must have a total population deviation— a gap between its most and least populous districts—that is overly large. *See, e.g.*, *Brown v. Thomson*, 462 U.S. 835, 842 (1983) (noting the 10% population deviation threshold for state legislative plans); *Karcher v. Daggett*, 462 U.S. 725, 732 (1983) (stating the threshold of "absolute population equality" for congressional maps). And as the Court confirmed in *Whitford*, "the only way to vindicate an individual plaintiff's right to an equally weighted vote" is through relief taking the form of "a wholesale 'restructuring of the geographical distribution of seats in a state legislature.'" 138 S. Ct. at 1921 (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)).

In a racial vote dilution suit under Section 2 of the Voting Rights Act, similarly, the first liability prong is district-specific: whether the minority group is "sufficiently large and geographically compact to constitute a majority in [an additional] single-member district."

*Thornburg v. Gingles*, 478 U.S. 30, 50 (1986). The next two *Gingles* prongs, though, involve the level of racial polarization in voting in a multi-district region or even the jurisdiction as a whole. *See, e.g.*, *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399, 427 (2006) (citing the district court's finding of "'racially polarized voting' in south and west Texas, and indeed 'throughout the State'"). Most of the probative factors mentioned by the 1982 Senate report that accompanied Section 2's revision also pertain to past actions by the "state or political subdivision"—and thus not to circumstances in any particular district. *Gingles*, 478 U.S. at 36-37. And as between examining a minority group's existing representation district by district, regionally or statewide, "the answer . . . is to look at proportionality statewide." *LULAC*, 548 U.S. at 437; *see also id.* at 438 (permitting plaintiffs to "allege[] statewide vote dilution based on a statewide plan").

Lastly, there is not just an ironclad doctrinal case for including a plan-wide stage in a partisan vote dilution proceeding; there is also a compelling practical justification. Suppose a plaintiff could prevail *solely* by showing that she and other residents of a given district were cracked or packed unnecessarily (thus establishing standing) and purposefully (thus proving district-specific partisan intent). All kinds of mischief could follow from such a lax liability standard. Districts could be struck down even if they belong to balanced maps, since the plan-wide symmetry might have been achieved through the deliberate (if not one-sided) cracking and packing of certain voters. Districts could also be invalidated even if they were crafted to undo a prior gerrymander. After all, negating one party's earlier cracking and packing could be seen as intentionally cracking and packing in favor of the previously victimized party.

The Assembly, then, should *welcome* the plan-wide stage of Plaintiffs' proposed test. This stage sharply *reduces* the likelihood of liability by requiring litigants to satisfy a series of plan-wide criteria before any district can be nullified. In particular, unless a map as a whole is (1) severely, (2) durably, and (3) unjustifiably asymmetric, no claim can get off the ground, and no

district can be disturbed. To put the point another way, the Assembly's fears of "inevitable litigation" and "partisan gerrymandering claims" that are "so easy to allege," dkt. 225, at 73, would be far more credible in the absence of the plan-wide stage. This stage makes partisan vote dilution claims much more difficult to win, and thus a much more "limited and precise" response to egregious gerrymandering. *Vieth*, 541 U.S. at 306 (Kennedy, J., concurring in the judgment).

### C.     The Associational Theory

The third and final matter within the scope of the Supreme Court's mandate is the development of the associational theory introduced in Justice Kagan's *Whitford* concurrence. *See supra* Background I.C. The Assembly's primary argument on this front is that Act 43 does not, by its own terms, burden the associational rights of Democratic voters, officials, or party organizations. On its face, that is, Act 43 "does not prohibit any [associational][8] activity," "does not impose costs on the exercise of any [associational] activity," "does not regulate the internal affairs of the Democratic party," and so on. Dkt. 225, at 74. Rather, any associational burdens suffered by Plaintiffs arise not due to Act 43 but because of "their fear that their speech will fail at achieving their ultimate ends." *Id.* at 77.

This precise argument was rejected in *all four* of the decisions that have considered associational claims since *Whitford*. In *Common Cause II*, North Carolina contended that its congressional plan did not "'chill' speech or 'deter' [the Democratic Party's] supporters 'from engaging in political speech or association.'" 318 F. Supp. 3d at 931. The district court emphatically disagreed. By effectively guaranteeing Republicans a 10-to-3 majority, the plan "had a constitutionally cognizable chilling effect on reasonable North Carolinians' First Amendment activities." *Id.* The plan caused voters not to turn out, reduced candidates' motivation to take part in debates, discouraged potential candidates from running, and hampered Democrats' efforts to

---

[8] The Assembly repeatedly conflates the terms "associational" and "expressive." To be clear, Plaintiffs bring only an associational claim; they do not allege a violation of their freedom of expression.

fundraise, attract strong candidates, and mobilize their supporters. *Id.* at 931-32. "All of these chilling effects on speech and association . . . represent cognizable, and recognized, burdens on First Amendment rights." *Id.* at 932.

In *Benisek v. Lamone*, ___ F. Supp. 3d ___, 2018 WL 5816831, at *21 (D. Md. 2018), likewise, Maryland asserted that Republican voters "lack[ed] standing to bring a partisan gerrymandering claim premised on harm to their associational rights." The district court again refuted this contention, explaining that "the associational injury" of a partisan gerrymander "is the burden imposed on the targeted party members' ability to affiliate with their political party to carry out its activities and achieve its aims." *Id.* In particular, due to the deliberate flipping of a congressional district from Republican to Democratic control, "interest among potential Republican voters . . . declined, fundraising diminished, and enthusiasm among members of the Republican Party was damaged." *Id.* "[T]his undisputed evidence amply demonstrate[d] that the plaintiffs' associational rights were burdened." *Id.* at *22.

In *League of Women Voters v. Johnson*, ___ F. Supp. 3d ___, 2018 WL 6257476 (E.D. Mich. 2018), furthermore, the district court held both that the League of Women Voters had standing to bring an associational claim against Michigan's congressional plan and that this claim is justiciable. The plan "made it more difficult for the League to convince Republican candidates to participate in 'candidate forums,'" "caused elected representatives to 'become less responsive' to the League's legislative proposals," and "caused many Michigan voters to experience 'voter apathy and cynicism.'" *Id.* at *11. And once more in *Ohio A. Philip Randolph Institute v. Smith*, ___ F. Supp. 3d ___, 2018 WL 3872330 (S.D. Ohio 2018), the district court held that certain groups had associational standing to challenge Ohio's congressional plan. The plan "weakens their ability to carry out their core functions and purposes because the map makes it more difficult to engage voters through their education, registration, and outreach efforts, and by deterring and

discouraging their members and other Ohio voters from engaging in the political process." *Id.* at *4 (internal alterations, citation, and quotation marks omitted).

These lower court cases were on firm ground in holding that district maps may impose cognizable associational burdens even though the burdens are not announced in the statutes themselves. In fact, the Supreme Court has understood for generations that associational rights may be infringed directly *or* indirectly—and that indirect breaches, occurring through the operation of a predictable intervening mechanism, may be just as troublesome as direct ones. Consider the foundational case of *NAACP v. Alabama*, 357 U.S. 449 (1958), where Alabama sought to compel the NAACP to reveal its membership list. This policy was not a "direct action to restrict the right of [NAACP] members to associate freely," yet that fact did "not end inquiry into the effect of the production order." *Id.* at 461 (internal citations omitted). The order's likely effect (which led to its invalidation) was that "it may induce [NAACP] members to withdraw from the Association and dissuade others from joining it because of fear of exposure of their beliefs." *Id.* at 463; *see also, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 65 (1976) (applying "exacting scrutiny" to campaign contribution disclosure requirements even though their associational burden on donors "arises, not through direct government action, but indirectly as an unintended but inevitable result of the government's conduct").

Or take the decisions cited by Justice Kagan's concurrence in *Whitford* and by Justice Kennedy's opinion in *Vieth* (which had previously flagged the associational theory). In *Elrod v. Burns*, 427 U.S. 347 (1976), the Court recognized not just the direct associational harms of patronage hiring but also the indirect ways in which it weakens the opposing party by dissuading people from affiliating with it. "Patronage thus tips the electoral process in favor of the incumbent party, and where the practice's scope is substantial relative to the size of the electorate, the impact on the process can be significant." *Id.* at 356. In *Anderson*, the Court held that an early filing

deadline for independent candidates burdens the associational rights of both these candidates and the voters who back them. "The exclusion of candidates also burdens voters' freedom of association," as "[v]olunteers are more difficult to recruit and retain, media publicity and campaign contributions are more difficult to secure, and voters are less interested in the campaign." 460 U.S. at 787-88, 792. And in *California Democratic Party v. Jones*, 530 U.S. 567, 577 (2000), the Court objected not just to how the blanket primary "forces political parties to associate with" voters they would prefer to exclude, but also to the policy's eventual effects on parties' ideological stances. "Such forced association has the likely outcome . . . of changing the parties' message. We can think of no heavier burden on a political party's associational freedom." *Id.* at 581-82.

It is thus unremarkable that Act 43 burdens Plaintiffs' associational rights not on its face but instead by making it harder for them to elect their preferred candidates. The presence of that predictable intervening mechanism does not distinguish partisan gerrymandering from disclosure requirements, patronage hiring, early filing deadlines, and the blanket primary, all of which also infringe associational rights indirectly, through the operation of foreseeable downstream factors. *See* Daniel P. Tokaji, *Gerrymandering and Association*, 59 Wm. & Mary L. Rev. 2159, 2206 (2018) (agreeing that this "justification applies with at least the same force to partisan gerrymandering as to any of the other practices upon which the right of association has focused in prior cases").

The Assembly's next argument is of the slippery-slope variety. If Act 43 unconstitutionally burdens Plaintiffs' associational rights, then "*any* law that has the intent and effect of making one political group more attractive to its members and potential members" must be invalid too. Case No. 18-cv-763-jdp, dkt. 28, at 11; *see also id.* at 12 (worrying that if "[l]egislative majorities pass laws to make them attractive to voters," those laws would be unconstitutional). To start, the Assembly's description of the genre of statutes into which Act 43 falls is preposterous. Act 43 is

exactly the opposite of a law aimed at improving the popularity of the party in control of the state government. It is a law designed to ensure that this party *stays* in power even when voters turn *against* it. In this Court's words, Act 43 seeks to "secure Republican control of the Assembly under any likely future electoral scenario for the remainder of the decade, in other words to entrench the Republican Party in power." Dkt. 166, at 71.

The Assembly also makes no effort to explain how its hypothetical statutes—"a broadly popular election-year tax-cut" and "an election-year college loan forgiveness act," Case No. 18-cv-763-jdp, dkt. 28, at 11, 11-12—could possibly violate the First Amendment. The Assembly does not claim that these laws would burden anyone's associational rights (let alone severely), nor would such a proposition be plausible. After all, no one is prevented (directly or indirectly) from associating with likeminded individuals by such ordinary legislation. The Assembly also does not even mention the state interests that its putative statutes might serve. But identifying these interests, and determining to what extent they are furthered, is a crucial part of the constitutional analysis. All we are left with, then, is a parade of horribles for which no work has been done to show that the examples actually *are* horribles.

Lastly, the Assembly cites a number of lower court decisions that supposedly support its position. One of these is a Tenth Circuit case, *Initiative and Referendum Institute v. Walker*, 450 F.3d 1082 (10th Cir. 2006) (en banc), that upheld a Utah constitutional provision requiring wildlife-related ballot initiatives to win supermajority support to be enacted. This case, however, did not involve an associational claim. It involved four *other* kinds of First Amendment theories—burdening core political speech, burdening expressive conduct, viewpoint discrimination, and overbreadth—but not the claim at issue here. *See id.* at 1098-99. *Initiative and Referendum Institute*'s view that restrictions on ballot initiatives cannot be challenged under the First Amendment is also far from undisputed; indeed, it is the subject of a vigorous circuit split. *See,*

*e.g.*, *Wirzburger v. Galvin*, 412 F.3d 271 (1st Cir. 2005). And whatever the case may be in other First Amendment areas, it is simply incorrect that "a law that has the 'inevitable effect' of reducing [association] because it makes particular [association] less likely to succeed" is immune from judicial scrutiny. *Initiative and Referendum Institute*, 450 F.3d at 1100. The Supreme Court decisions discussed above make clear that indirect, but predictable, associational burdens are indeed cognizable.

The other cases invoked by the Assembly rejected First Amendment challenges to district plans and then were summarily affirmed by the Supreme Court. *See League of Women Voters v. Quinn*, No. 1:11–cv–5569, 2011 WL 5143044 (N.D. Ill. Oct. 28, 2011); *Anne Arundel Cty. Republican Cent. Comm. v. State Admin. Bd. of Election Laws*, 781 F. Supp. 394 (D. Md. 1991); *Badham v. Eu*, 694 F. Supp. 664 (N.D. Cal. 1988). But, like *Initiative and Referendum Institute*, these cases solely considered non-associational theories. Indeed, the only reference in any of the cases to the right of association was a single line in *Badham* that conflated it with other First Amendment freedoms. *See id.* at 675 ("Plaintiffs' next contention is that [the disputed plan] violates the First Amendment by 'penalizing Republican voters solely because of their party affiliations, political beliefs and associations and by chilling public debate on issues of public importance.'").

It is also plain that the Supreme Court does not consider itself bound by its summary affirmances of these decisions. Both Justice Kagan in *Whitford* and Justice Kennedy in *Vieth* advanced First Amendment theories of partisan gerrymandering without paying the slightest heed to these affirmances. Still more dramatically, when plaintiffs alleged that "Maryland's redistricting plan burdens their First Amendment right of political association," the Court unanimously reversed the lower courts' refusal to convene a three-judge panel. *Shapiro*, 136 S. Ct. at 453. In doing so, the Court confirmed that this claim remains very much available. "Whatever [the criteria for

convening a three-judge panel] mean, at a minimum they cannot [preclude] a plea for relief based on a legal theory put forward by a Justice of this Court and uncontradicted by the majority in any of our cases." *Id.* at 456.

### III. This Court Should Reject the Assembly's Arguments That Are Beyond the Scope of the Supreme Court's Mandate.

This leaves the Assembly's many arguments that are beyond the scope of the Supreme Court's mandate. As explained earlier, this Court need not and should not address these arguments. *See supra* Argument I. Nevertheless, in an abundance of caution, Plaintiffs do respond here to these extraneous claims. With respect to points that have previously been made in this litigation (which is most of them), Plaintiffs show where they were raised and how both Plaintiffs and this Court rebutted them. With respect to the Assembly's few genuinely new contentions, Plaintiffs engage with them on the merits.

#### A. Nonjusticiability

The Assembly's first argument that is untethered to *Whitford*, then, is that partisan gerrymandering claims are categorically nonjusticiable. Dkt. 225, at 9-11, 67-73. The Assembly does not (because it cannot) assert that this nonjusticiability claim somehow falls within the scope of the Supreme Court's mandate. Defendants also repeatedly advanced the claim in earlier proceedings in this case. *See, e.g.*, dkt. 25, at 2 ("[T]his is a nonjusticiable political question . . . ."); dkt. 43, at 8 ("[D]efendants ask this court to grant their motion to dismiss on the ground that plaintiffs' claims are not justiciable . . . ."); dkt. 150, at 293 (statement in closing argument by Defendants' counsel that "it truly isn't justiciable" and "[t]here just is no way to determine partisan gerrymanders").

For their part, Plaintiffs showed in their brief opposing Defendants' motion to dismiss that "the [Supreme] Court has thrice decided . . . that a challenge to a district plan on grounds of partisan gerrymandering is justiciable." Dkt. 31, at 5; *see also id.* at 14-18; dkt. 155, at 2 ("hold[ing]

partisan gerrymandering claims nonjusticiable" is "precluded by Supreme Court precedent, which plainly establishes the justiciability of these claims"). In its unanimous decision denying Defendants' motion to dismiss, this Court, too, reviewed the relevant Supreme Court cases and "decline[d]" to hold partisan gerrymandering claims nonjusticiable because "defendants' position has not been adopted by a majority of the justices on the Supreme Court." Dkt. 43, at 9. This Court elaborated that *Davis v. Bandemer*, 478 U.S. 109 (1986), "controls on the narrow question whether partisan gerrymandering claims are barred under the political question doctrine," and observed that "[u]ntil a majority of the Supreme Court rules otherwise, lower courts must continue to search for a judicially manageable standard." Dkt. 43, at 9; *see also, e.g.*, dkt. 94, at 3 (pointing out that the Court "answered . . . in the affirmative" the question "whether challenges to a partisan gerrymander were justiciable"); dkt. 166, at 19 ("We first noted that the claim was justiciable . . . .").

## B.      Intent Prong

Second, the Assembly claims that "plaintiffs' standard fails to contain any intent or purpose requirement." Dkt. 225, at 24. This certainly comes as news to Plaintiffs. As detailed above, Plaintiffs' proposed test *begins* with a district-specific discriminatory intent requirement. There can be liability under the test only if a particular district was designed purposefully to crack or pack the targeted party's voters and thus to dilute their electoral influence. *See supra* Background II.B.

## C.      Majoritarianism and Proportionality

Third, the Assembly maintains that the efficiency gap either replicates the majoritarianism principle rejected in *Vieth* or compels jurisdictions to adopt proportional representation. Dkt. 225, at 25-28. The Assembly does not (because it cannot) assert that this argument somehow falls within the scope of the Supreme Court's mandate. This argument was also Defendants' primary point in

40

their motion-to-dismiss brief. *See, e.g.*, dkt. 25, at 19 (the efficiency gap "merely repackag[es] the standard rejected in *Vieth* with an added veneer of math"); *id.* at 15 ("The 'efficiency gap' has no relation to a constitutional violation because . . . political groups (including the two major political parties) do not have a right to seats in the legislature in proportion to their percentage of the state wide vote total."); *see also, e.g.*, dkt. 46, at 47 (the efficiency gap "is a measure of proportionality, which is something the Supreme Court has rejected as a constitutional right"); dkt. 133, at 12 ("[A] standard based on proportional representation is not grounded in the Constitution . . . .").

Plaintiffs responded at length to both variants of this claim in their brief opposing Defendants' motion to dismiss. One of the brief's sections was entitled "Partisan Symmetry Is Distinct from Majoritarianism," dkt. 31, at 26, and another was called "Partisan Symmetry Is Distinct from Proportional Representation," *id.* at 23. Plaintiffs reiterated these refutations throughout the litigation. *See, e.g.*, dkt. 68, at 50 ("[P]laintiffs' proposed test would not require proportional representation."); dkt. 134, at 57-58. This Court, too, explained on multiple occasions that partisan symmetry is a separate concept from either majoritarianism or proportional representation. In its motion-to-dismiss opinion, for example, the Court noted that not only did "the plaintiffs in *Bandemer*, *Vieth* and *LULAC* . . . not rely on partisan symmetry," but "some of the justices have pointed to partisan symmetry as a theory with promise." Dkt. 43, at 21. The Court further observed that "an election's results may have a small efficiency gap without being proportional or they may be proportional and still have a large efficiency gap." *Id.* at 20.

In its summary judgment opinion, similarly, the Court stressed that Defendants themselves "acknowledge that plaintiffs' test does not require proportional representation." Dkt. 94, at 21. The Court added that there is nothing objectionable about the consideration of plan-wide seat and vote data; indeed, "*any* objective standard for measuring partisan gerrymandering will have some connection to the basic principle that the collective will of the people should not be subverted

indefinitely." *Id.* at 22-23. And once more in its post-trial opinion, the Court rebuffed the "claim that use of the EG is foreclosed by Supreme Court precedent." Dkt. 166, at 84. "[T]he EG does not impermissibly require that each party receive a share of the seats in proportion to its vote share." *Id.* at 86. Thus neither "*Vieth* or *LULAC* preclude [the Court's] consideration of the EG measure." *Id.* Nor do they "preclude[] [the Court] from looking at the ratio of votes to seats in assessing a plan's partisan effect." *Id.* at 85.

### D.     Voter Partisanship

Fourth, the Assembly points out that voters' decisions are affected by factors other than partisanship, such as incumbency, campaign spending, scandal, and the like. Dkt. 225, at 28-33. Relatedly, the Assembly offers a toy example where these nonpartisan factors supposedly result in a misleading efficiency gap for a hypothetical seven-district plan. *Id.*[9] The Assembly does not (because it cannot) assert that this argument somehow falls within the scope of the Supreme Court's mandate. Defendants also made the same argument in their summary judgment brief, claiming that "Democratic candidates would have won" certain close races "if they ran different candidates, emphasized different issues, or spent more money on the races." Dkt. 46, at 52; *see also, e.g.*, *id.* at 49 (criticizing Plaintiffs' experts for "ignor[ing] an important political reality: the power of incumbency"); dkt. 133, at 18 (noting that some races are "decided by candidate quality, issues emphasized, the quality of campaigns and other factors of political campaigns"). Defendants' experts further presented several toy examples making the Assembly's point that the efficiency gap can be influenced by nonpartisan variables. *See, e.g.*, dkt. 51, at 8-10; dkt. 55 ¶¶ 143-48.

In response, both Plaintiffs and this Court emphasized the need to conduct sensitivity testing before concluding that a district plan has a discriminatory effect. *Of course* certain voters

---

[9] This toy example includes the same erroneous calculations of wasted votes as two later toy examples in the Assembly's brief. *See infra* Argument III.I.

may change their minds based on the nonpartisan factors cited by the Assembly. That is why it is crucial to swing the vote by several points in each party's direction, and to ensure that the line-drawing party would retain its advantage even in the event of these shifts. As the Court put it, "[t]here was consensus among the experts"—including the Assembly's own consultant, Professor Keith Gaddie, and Defendants' own expert, Professor Nicholas Goedert—"that some type of swing analysis was the accepted method of testing how a particular map would fare under different electoral conditions." Dkt. 166, at 75-76 n.255; *see also, e.g.*, *id.* at 75-80 (further discussing sensitivity testing); dkt. 94, at 18 (same); dkt. 68, at 27-29, 34-36 (same); dkt. 134, at 51-52, 73 (same); dkt. 155, at 11-12, 16 (same).

The Court also identified two more flaws in the Assembly's voter partisanship argument. First, if nonpartisan factors really are significant drivers of Wisconsin voters' choices, then election results at different jurisdictional levels should not be highly correlated. After all, the candidates are different at each level, and so are their records, their spending, their charisma, their incumbency, and so on. Yet the composite score used by Act 43's drafters, which was calculated using *statewide* election results from 2004 to 2010, was "an almost perfect proxy" for the open seat index created by Professor Gaddie, which was based on *Assembly* election results over this period. Dkt. 166, at 9-10. Similarly, both the drafters' composite score and Professor Gaddie's open seat index "correlated almost identically" with Professor Mayer's baseline, which was generated using *2012* presidential and Assembly election results. *Id.* at 10 n.31 (internal quotation marks and brackets omitted); *see also, e.g.*, dkt. 54, at 30 (finding an R^2 of 0.96 for a regression of Professor Mayer's baseline on the drafters' composite score); *id.* at 21 (constructing a model using the 2012 presidential vote that explained 99% of the variance in the 2012 Assembly vote).

The other problem with the Assembly's argument is that Act 43's drafters did not believe it. If they had thought that candidate quality, campaign spending, scandal, and the like were

43

important, they would have considered these variables during the three months they spent designing the plan. But they did not. To the contrary, they *only* studied raw election results—indeed, results for statewide rather than Assembly races—as they "sought to understand the partisan effects of the maps they were drawing." Dkt. 166, at 70. In all of the drafters' many analyses of Act 43, *not one* cited any of the nonpartisan factors that the Assembly now invokes.

### E.    Identifiable Group

Fifth, the Assembly asserts that the individual plaintiffs do not belong to an "identifiable group" because they cannot guarantee that they always will vote (and always have voted) for Democratic candidates. Analogously, the "comparators" are ambiguous as well since other voters may support Republican candidates in some, but not all, elections. Dkt. 225, at 33-36. The Assembly does not (because it cannot) assert that this argument somehow falls within the scope of the Supreme Court's mandate. The argument is also just another version of the Assembly's previous point—that partisanship is not the only driver of voters' decisions—and thus fails for the same reasons. To wit: If substantial numbers of voters do change their minds from race to race and year to year, sensitivity testing will reveal the effects of these shifts. In Wisconsin, substantial numbers of voters do *not* vote primarily on the basis of nonpartisan factors, at least not in the state's recent political history. And unlike the Assembly, Act 43's drafters had no trouble distinguishing between "Democratic" and "Republican" voters.

The Assembly's argument, moreover, is highly premature. Plaintiffs' amended complaint alleges that the individual voters "support the election of Democratic candidates and the implementation of Democratic policies." Dkt. 201 ¶ 16. The document further alleges that each individual voter is "a supporter of Democratic candidates and policies." *E.g.*, *id.* ¶ 18. Perhaps the Assembly will be able to show in discovery or at trial that these allegations are false—that the individual voters actually are not Democrats but rather swing voters who choose between

candidates largely on nonpartisan grounds. At this stage, though, the Court must assume the allegations are true. This assumption disposes of the Assembly's claim since individual voters who *are* loyal Democrats may certainly assert that their votes have been diluted by district lines that intentionally and unnecessarily crack or pack them.

Lastly, the Assembly is wrong that, as a doctrinal matter, the preferences of vote dilution plaintiffs must be a perfect mirror image of the views of the rest of the electorate. Under Section 2 of the Voting Rights Act, minority voters must merely be "politically cohesive" to satisfy the second *Gingles* prong. 478 U.S. at 51. It is thus unproblematic if *some* minority voters oppose minority-preferred candidates; "distinctive minority group interests" disappear only if *many* minority members cast their votes against these candidates. *Id.* Likewise, the third *Gingles* prong requires only "legally significant" (not absolute) "white bloc voting." *Id.* at 54. This standard was met in *Gingles* itself where "81.7% of white voters did not vote for any black candidate in the primary elections," meaning that 18.3% of white voters did cross over. *Id.* at 59; *see also, e.g.*, *LULAC*, 548 U.S. at 427 (finding sufficient racial polarization where 8% of minority voters supported a non-minority-preferred candidate and 12% of white voters opposed him).

### F.   Other Redistricting Theories

Sixth, the Assembly describes (at oddly great length) other redistricting causes of action: malapportionment, racial gerrymandering, and racial vote dilution under both the Constitution and Section 2 of the Voting Rights Act. The Assembly's point appears to be that neither partisan gerrymandering generally, nor Plaintiffs' proposed test for partisan vote dilution specifically, is identical to any of these other theories. Dkt. 225, at 39-53. The Assembly does not (because it cannot) assert that this argument somehow falls within the scope of the Supreme Court's mandate. The argument is also quite banal: No one has ever claimed that partisan gerrymandering is the

same as any other redistricting cause of action. If it were the same, the contours of a partisan gerrymandering suit would be widely accepted, not hotly contested.

Nevertheless, Plaintiffs agree with the Assembly that other redistricting theories are highly probative here. But far from undermining Plaintiffs' proposed test for partisan vote dilution, these theories establish that each of its elements is doctrinally familiar and judicially manageable. Start with standing, which exists under *Whitford* when a plaintiff is cracked or packed by her own district, and could be uncracked or unpacked by a differently shaped district. *See supra* Background I.A. This inquiry is very similar to the first *Gingles* prong, which asks "whether an *additional* majority-minority district [may] be created" in a given region. *LULAC*, 548 U.S. at 495 (opinion of Roberts, C.J.). Like the *Whitford* standing analysis, the first *Gingles* prong requires an unfavorable status quo: a cracked or packed district in the former case, the absence of a majority-minority district in the latter. Also like the *Whitford* standing analysis, the first *Gingles* prong demands the possibility of improvement: an uncracked or unpacked district in the former case, a new majority-minority district in the latter.

Consider, next, the discriminatory intent prong of Plaintiffs' test. In every racial gerrymandering case, courts must decide whether "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). This district-specific examination of intent determines whether strict scrutiny or rational basis review is employed. *See id.* at 913. It is thus the linchpin of the doctrine and an element that courts have addressed without undue difficulty in dozens of cases.

The discriminatory effect prong of Plaintiffs' test has clear doctrinal analogues too. In *Johnson v. De Grandy*, 512 U.S. 997, 1014 n.11 (1994), the Supreme Court held that before liability may be imposed in a Section 2 case, the existing "number of majority-minority voting

districts" in the jurisdiction must be compared to "minority members' share of the relevant population." Just as this "degree of disproportionality" helps determine whether racial vote dilution has occurred, *id.* at 1020 n.17, the extent of partisan asymmetry bears on whether votes have been diluted on partisan grounds. In *Gingles*, the Court also established that minority voters' "lack of success over the course of several recent elections" bolsters their claim. 478 U.S. at 76; *see also id.* at 77 (pointing out that, conversely, "persistent proportional representation is inconsistent with" racial vote dilution). This emphasis on the durability of a plan's discriminatory effect, of course, mirrors that of Plaintiffs' test.

Lastly, as this Court observed in its post-trial opinion, the justification prong of Plaintiffs' test is "consistent with the [Supreme] Court's approach in the state legislative malapportionment context." Dkt. 166, at 91. In that context, "larger disparities in population . . . create[] a prima facie case of discrimination and therefore must be justified by the State." *Brown*, 462 U.S. at 842-43; *see also, e.g.*, *Voinovich v. Quilter*, 507 U.S. 146, 161 (1993) ("[A]ppellees established a prima facie case of discrimination, and appellants were required to justify the deviation."). So too, here, after plaintiffs prove district-specific partisan intent and a severe and durable plan-wide partisan asymmetry, the burden shifts to the State to try to show that the skew can be justified by its political geography or legitimate redistricting goals.

## G.    Justification

Seventh, the Assembly lists a series of objections to this justification prong: It is overly stringent because it requires the State to prove that its plan's partisan asymmetry is "necessary." Unlike the malapportionment case law, the prong applies to a map as a whole rather than a particular district. The prong denies the State the ability to vindicate a given district by establishing its compliance with traditional criteria. And there is no way to determine whether a plan's skew is attributable to political geography. Dkt. 225, at 53-59. The Assembly does not (because it cannot)

assert that these points somehow fall within the scope of the Supreme Court's mandate. Defendants also previously made the same points at earlier stages in the litigation. *See, e.g.*, dkt. 156, at 5 (criticizing the justification prong for "mak[ing] the State prove that the *EG* was 'necessary' or 'unavoidable'"); dkt. 133, at 4 (arguing that districts are justified when adhere to "traditional districting principles including equal population, compactness, [and] municipal splits"); dkt. 46, at 34-40 (extensively discussing political geography as a justification).

In response, both Plaintiffs and this Court identified the problem with each argument. The justification prong does *not* require the State to demonstrate the "necessity" of its plan's partisan asymmetry. Rather, as the prong's label ("justification") suggests, it "allow[s] the defendants to avoid liability if they can *justify* [a map's] effects on the basis of legitimate districting goals or [a State's] natural political geography." Dkt. 166, at 90; *see also, e.g.*, dkt. 134, at 74 (noting that "plaintiffs' articulation of the prong now reflects the majority view that justification, not necessity, is the crux of the inquiry").

The Assembly is also incorrect that, in the malapportionment context, population deviations are justified district by district instead of on a plan-wide basis. Invoking Supreme Court decisions such as *Brown*, *Voinovich*, and *Connor v. Finch*, 431 U.S. 407, 414 (1977), this Court made clear that it is the total population deviation of the entire map that must actually be justified in a one person, one vote case. *See, e.g.*, dkt. 94, at 33 ("[T]he burden shifts to the defendants to show that their *plan* is 'justified.'" (emphasis added)); *id.* at 34 (citing additional decisions requiring "'the population differences'" to be justified); *see also, e.g.*, dkt. 134, at 74-75 ("[T]he Court's reapportionment cases refer over and over to the 'deviations' or 'variations' for which the State must account.").

The Court further refuted the Assembly's contention that districts are automatically justified if they abide by traditional criteria. The Court deemed this proposed "safe harbor" a

"novel rule" that "finds no support in the law." Dkt. 166, at 61. The Court elaborated that "'traditional districting principles' are not synonymous with equal protection requirements" since "lawmakers [may] pursue partisan advantage without sacrificing compliance with traditional districting criteria." *Id.*; *see also, e.g.*, dkt. 155, at 17 ("Thanks to advances in redistricting technology, it is easy to design plans whose districts are highly compact and respectful of political subdivisions—but very asymmetric in their partisan consequences.").

And as for the alleged indeterminacy of political geography, the Court disposed of this objection too by going through the relevant evidence and concluding that "it simply does not explain adequately the sizeable disparate effect seen in 2012 and 2014 under Act 43." Dkt. 166, at 91. The Court emphasized that "the defendants' own witnesses produced the most crucial evidence against justifying the plan on the basis of political geography," since they "produced multiple alternative plans that would have achieved the legislature's valid districting goals while generating a substantially smaller partisan advantage." *Id.*; *see also, e.g.*, dkt. 155, at 78-81 (corroborating the Court's conclusion based on Professor Mayer's Demonstration Plan, Professor Chen's randomly generated maps, and Wisconsin's Assembly plans in previous cycles).

### H.   Imputations

Eighth, the Assembly complains about the imputations performed by Plaintiffs' expert, Professor Simon Jackman, to estimate the parties' levels of support in uncontested districts. Dkt. 225, at 59-60. The Assembly does not (because it cannot) assert that this grievance somehow falls within the scope of the Supreme Court's mandate. Defendants also previously argued that Professor Jackman's "imputations in uncontested races" are impermissibly "based on a counterfactual." Dkt. 46, at 51. Defendants' expert devoted a section of his report as well to the claim that "Dr. Jackman's imputation strategy is problematic." Dkt. 55, at 43; *see also* dkt. 51, at

16 (further criticizing Professor Jackman for "imputing votes for counterfactual electoral situations").

Plaintiffs responded that all of Professor Jackman's efficiency gap calculations, and downstream analyses based on these calculations, properly note the uncertainty intervals attributable to the imputations. Dkt. 62, at 27. Plaintiffs also pointed out that the Assembly's own consultant, Professor Gaddie, "imputed election results in uncontested races" too, dkt. 68, at 54, while Defendants' own expert, Professor Goedert, used the far cruder imputation method of "not adjusting for the uncontestedness *at all*, and simply treating the races as if all of the vote went to one party and none to the other," dkt. 63, at 4. This Court, furthermore, observed that "defendants have not contested the accuracy" of the statewide vote shares reported by Professor Jackman. Dkt. 166, at 16 n.75. These vote shares, of course, are based on actual results in contested races *and* imputed outcomes in uncontested races.

### I.   Toy Examples

Ninth, the Assembly offers two more toy examples where a hypothetical plan's efficiency gap does not correspond to the Assembly's intuition about the plan's partisan fairness. Both examples feature significantly unequal turnout across districts; the latter example also exhibits asymmetric packing. Dkt. 225, at 60-63. The Assembly does not (because it cannot) assert that these examples somehow fall within the scope of the Supreme Court's mandate. Defendants also previously raised identical objections to the efficiency gap. *See, e.g.*, dkt. 46, at 11 (criticizing Professor Jackman for "assum[ing] an equal number of votes are cast in each district" because "Wisconsin does not have equal turnout across districts"); dkt. 55 ¶¶ 106-31 (providing many more examples of plans with allegedly unintuitive efficiency gaps).

In response, both Plaintiffs and this Court explained that in real (as opposed to toy) examples, it makes virtually no difference whether turnout is assumed to be equal or allowed to

vary across districts. "[R]ecord evidence indicat[es] that Professor Jackman's shortcut . . . correlate[s] highly with both the full method and electoral reality." Dkt. 166, at 86; *see also, e.g.*, dkt. 68, at 39 ("The two methods produce nearly identical estimates in all cases, never varying by more than 1.0% and exhibiting a correlation of 0.997."). Both Plaintiffs and this Court also showed that allegedly unintuitive efficiency gaps do not yield wrong legal outcomes thanks to the other prongs of the Court's test. "If a nonpartisan or bipartisan plan displays a high EG, the remaining components of the analysis will prevent a finding of a constitutional violation." Dkt. 166, at 87. Likewise, "a challenge to a map enacted with egregious partisan intent but demonstrating a low EG also will fail because the plaintiffs cannot demonstrate the required discriminatory effect." *Id.*; *see also, e.g.*, dkt. 134, at 55-57.

It is worth pointing out as well that the Assembly's toy examples are rife with errors. Each wasted vote calculation is incorrect because the Assembly treats the difference between the winning party's votes *and the losing party's votes* as the number of surplus votes. In fact, this number should be the difference between the winning party's votes *and the 50% threshold at which the party wins the seat.*[10] *See* dkt. 166, at 150-52 (Griesbach, J., dissenting) (discussing this exact issue in considerable detail). The Assembly's vote totals in its second example are inaccurate too. Democrats actually receive 92,000 (not 170,000) votes, and Republicans actually receive 102,000 (not 170,000) votes.

### J.     Lack of Mechanism

Tenth, the Assembly contends that Plaintiffs' proposed test does not "include a mechanism identifying these examples" of liability. Dkt. 225, at 63. The Assembly does not (because it cannot) assert that this argument somehow falls within the scope of the Supreme Court's mandate. Plaintiffs also do not understand what kind of "mechanism" the Assembly has in mind. Under

---

[10] This flaw also applies to the Assembly's toy example discussed earlier. *See supra* Argument III.D.

Plaintiffs' test, a district is unconstitutional if (1) it unnecessarily and intentionally cracks or packs a party's voters; and (2) it belongs to a district plan that is (a) severely, (b) durably, and (c) unjustifiably asymmetric. If any of these criteria is not met, the district is valid. *See supra* Background II.B. Perhaps this is the "mechanism" to which the Assembly refers.

### K.     Nonpartisan Races

Finally, the Assembly complains that Plaintiffs' proposed test is inapplicable to nonpartisan races. Dkt. 225, at 64. The Assembly does not (because it cannot) assert that this argument somehow falls within the scope of the Supreme Court's mandate. The point may also freely be conceded. Yes, a test for *partisan* vote dilution does not extend to nonpartisan races where this form of dilution is impossible. So too, the *Gingles* framework for racial vote dilution is inappropriate for claims brought by plaintiffs not defined by their race or ethnicity; and the one person, one vote standard is inapt for suits alleging non-numerical vote dilution. Each test obviously works only within its own domain.

### CONCLUSION

For the foregoing reasons, this Court should deny the Assembly's motion to dismiss. The Court should also reiterate its earlier ruling that this case must be resolved "*within* the mandate of the Supreme Court." Dkt. 199, at 2 (emphasis added). To date, the Assembly has flouted this admonition. If it continues to do so, discovery and trial will be derailed by extraneous issues and the case's "expeditious resolution," *id.* at 1-2, will become impossible.

By: /s/ Nicholas O. Stephanopoulos
*One of the Attorneys for Plaintiffs*

/s/ Nicholas O. Stephanopoulos
Nicholas O. Stephanopoulos
UNIVERSITY OF CHICAGO LAW SCHOOL
1111 E. 60th St.
Chicago, IL 60637
(773) 702-4226
nsteph@uchicago.edu

/s/ Annabelle E. Harless
Annabelle E. Harless
Ruth M. Greenwood
CAMPAIGN LEGAL CENTER
73 W. Monroe St., Ste. 302
Chicago, IL 60603
(312) 561-5508
aharless@campaignlegalcenter.org
rgreenwood@campaignlegalcenter.org

/s/ Douglas M. Poland
Douglas M. Poland
State Bar No. 1055189
Alison E. Stites
State Bar. No. 1104819
RATHJE WOODWARD LLC
10 East Doty St., Ste. 507
Madison, WI 53703
(608) 960-7430
dpoland@rathjewoodward.com
astites@rathjewoodward.com

/s/ J. Gerald Hebert
J. Gerald Hebert
Danielle M. Lang
CAMPAIGN LEGAL CENTER
1411 K. St. NW, Ste. 1400
Washington, DC 20005
(202) 736-2200
ghebert@campaignlegalcenter.org
dlang@campaignlegalcenter.org

/s/ Peter G. Earle
Peter G. Earle
State Bar No. 1012176
LAW OFFICE OF PETER G. EARLE
839 N. Jefferson St., Ste. 300
Milwaukee, WI 53202
(414) 276-1076
peter@earle-law.com

/s/ Michele L. Odorizzi
Michele L. Odorizzi
MAYER BROWN LLP
71 S. Wacker Dr.
Chicago, IL 60606
(312) 701-7309
modorizzi@mayerbrown.com

*Attorneys for Whitford Plaintiffs*

/s/ Lester A. Pines
Lester A. Pines
State Bar No. 1016543
Magdalene Alison TenBruggencate
122 W. Washington Ave., Ste. 900
Madison, WI 53703
(608) 251-0101
lpines@pinesbach.com

/s/ Peter G. Earle
Peter G. Earle
State Bar No. 1012176
LAW OFFICE OF PETER G. EARLE
839 N. Jefferson St., Ste. 300
Milwaukee, WI 53202
(414) 276-1076
peter@earle-law.com

/s/ Nicholas O. Stephanopoulos
Nicholas O. Stephanopoulos
UNIVERSITY OF CHICAGO LAW SCHOOL
1111 E. 60th St.
Chicago, IL 60637
(773) 702-4226
nsteph@uchicago.edu

*Attorneys for Wisconsin Assembly Democratic Campaign Committee*